UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

Tracey EMERSON,

                              Plaintiff,

            -against-

COMMISSIONER OF SOCIAL SECURITY

                              Defendant.

-------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:___  9/16/2013

12-CV-06451 (PAC)(SN)

REPORT AND
RECOMMENDATION

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE PAUL A. CROTTY:

            Plaintiff Tracey Emerson, appearing *pro se*, brings this action pursuant to § 205(g) of the

Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the final determination of

the Commissioner of Social Security (the "Commissioner") denying her Supplemental Security

Income ("SSI") benefits. The Commissioner has moved for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure, and Emerson did not reply. Because I

conclude that the ALJ's determination of Emerson's residual functional capacity ("RFC") is not

supported by substantial evidence, I recommend that the Commissioner's motion be DENIED

and the case remanded to the Commissioner for further proceedings.

## FACTUAL BACKGROUND

### I.      Medical Evidence Submitted to ALJ

            The following facts are taken from the administrative record. Emerson was born on

March 2, 1970. She attended school through the tenth grade, and later achieved a general

equivalency degree ("GED") sometime around 1997 or 2000. Emerson does not have an

extensive work history, but was employed as a cashier from 1991 to 1997, and again in 2005. She previously applied, and was granted, disability benefits that were discontinued and other benefits that were terminated when she went to prison for more than a year. At several other times, she also applied and was denied disability benefits. For the purposes of this action, Emerson alleges that she has not engaged in substantial gainful activity since – and thus became disabled on – October 30, 2008.

### A.  Medical Evidence Before October 2008

In February 1990, Emerson was in a car accident and suffered a collapsed left lung and a broken right leg that required a surgical rod to repair. She was in a coma for a week, and then received inpatient rehabilitation services that included efforts to address mildly decreased language skills and moderately decreased short- and long-term memory. She completed rehabilitation in April 1990. On June 27, 1990, a mental status examination was performed on Emerson. She appeared essentially recovered from the car accident, and the examining doctor found no intellectual or neural deficient. Emerson also appeared able to handle her finances.

In June 1992, Dr. Richard Weiss performed a psychological evaluation of Emerson. He found that Emerson was calm, spoke spontaneously, and provided no indication of major depression. She declined to undergo intelligence testing, but Dr. Weiss found no evidence of any mental limitations. Based on his in person observations, and review of a prior examination report from 1990, Dr. Weiss also found that Emerson presented some degree of manipulation to obtain secondary gain from her symptoms. From a personality standpoint, Dr. Weiss found that Emerson had a borderline personality disorder marked by impulsiveness, affective instability and inappropriate anger or lack of control.

2

In 1995, Emerson contracted Hepatitis C, and was treated with Interferon for six months. Emerson also reported that she was diagnosed with the Human Immunodeficiency Virus ("HIV"), either in 2001 or 2002.

In August 2005, Emerson was assaulted by a man who stabbed, robbed and raped her. As a result of the attack, Emerson suffered a collapsed right lung. She then underwent surgery, and developed a post-surgical hernia.

On November 14, 2005, Emerson underwent a psychological disability evaluation and took the Wechsler Adult Intelligence Scale – Third Edition ("WISC-III"). She scored a full scale IQ of 59, indicating an overall intellectual functioning in the mild mentally disabled range. Her verbal IQ was 69 and her performance IQ was 67. During the evaluation, Emerson's productivity of thought was hesitant but her continuity of thought was relevant and goal-directed. Her examiner again was Dr. Weiss, who assessed chronic post-traumatic stress disorder and anxiety disorder on Axis I; mild mental disability on Axis II; HIV, brain damage and Hepatitis C on Axis III; severe stressors on Axis IV; and a global assessment of functioning ("GAF") of 34 on Axis V.[1]

On January 3, 2008, Dr. Herbert Meadow performed a psychiatric examination of Emerson. Although Emerson arrived at the interview with a friend, she stated that she was able to travel on her own. At her interview, Emerson reported a history of mood swings stabilized by

---

[1] These diagnoses reflect an assessment on several axes, each referring to a different domain of information. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") (rev. 4th ed. 2000). Axis I refers to clinical disorders and other conditions that may be a focus of clinical attention; Axis II refers to personality disorders and mental retardation; Axis III refers to general medical conditions; Axis IV refers to psycho-social and environmental problems; and Axis V refers to GAF. A clinician's judgment of an individual's overall level of functioning can be reported using the GAF scale. A GAF of 31 to 40 indicates some impairment in reality testing or communication, or a major impairment in several areas such as work or school, family relations, judgment, thinking or mood. See Paduani v. Comm'r of Soc. Sec., 08 Civ. 05271 (RJD), 2010 WL 1816262, at *2 (E.D.N.Y. May 5, 2010).

medication, and described depressive and manic symptomology. She denied any history of drug abuse.

Dr. Meadow performed a mental status evaluation on Emerson. He found that her gait was unremarkable and that she had no psychomotor pathology. Emerson made eye contact and was cooperative, with no evident thought disorder, or auditory or visual hallucinations noted. Emerson's mood was depressed but her affect was appropriate to thought content. She was oriented to time, place and person. Her general fund of information was within normal limits. She was able to repeat four numbers forward and backwards, and was able to count backwards from 20 in increments of three. Dr. Meadow also found that Emerson's recent and remote memories were intact, and that she had adequate comprehension. Her intelligence appeared to be in the average range, and her insight and judgment were unimpaired. Emerson stated that she took care of her own personal hygiene, performed all household chores when she felt physically capable, had friends, watched television and listened to music.

Dr. Meadow opined that Emerson had a psychiatric disorder that did not necessarily interfere with her ability to function either on a daily basis or in a vocational setting. He diagnosed bipolar disorder on Axis I; deferred diagnosis on Axis II; and HIV, arthritis and back pain on Axis III.

Medical records from the New York State Department of Correctional Services, dated from February 2008 through April 2008, indicate that Emerson had a hernia, and that she was treated for an infection of the umbilical area on several occasions.

### B.  Medical Evidence After October 2008

### (1) Consultative Examination Reports

On February 11, 2009, Dr. Lamberto Flores examined Emerson. Emerson provided her psychiatric history dating back to 1990, but denied any psychiatric follow-up with anyone but her primary doctor. She reported a history of migraine headaches, relieved through rubbing her head. She said that she was on Seroquel and Oxycodone as needed for her pain, but was not on any medication for her HIV or Hepatitis C.

Emerson also reported that she could not walk more than a quarter of a block without right leg pain. She denied any symptoms tied to prolonged sitting, but said that she could not tolerate prolonged standing for more than 15 minutes without leg discomfort. She climbed stairs slowly, one step at a time, and had to rest after a half-flight. She could not lift more than five pounds. She watched television and listened to the radio, cooked, cleaned and did her laundry, and handled her own personal needs.

Upon physical examination, Emerson appeared well-developed and well-nourished. She was oriented, coherent, and alert. She dressed normally and was in no acute distress. Emerson's abdomen revealed a reducible hernia measuring 13 centimeters by two centimeters. She had tenderness in the L3-L5 spinal area. She could perform straight leg raises and bend forward in her spine to 70 degrees, and had full range of motion in her right knee, although she reported pain on flexion. Otherwise, she had no knee tenderness. Emerson's hand dexterity and fine manipulation were normal. She presented no evidence of muscle spasm. Her muscle strength was five out of five, with no sensory loss. Her posture and gait were normal. She did not need a cane to ambulate, and exhibited no difficulty getting on and off the examining table or dressing. She could squat one-third of the way down.

Dr. Flores assessed a history of HIV, Hepatitis C, drug use, depression, multiple stab wounds with surgical correction and a reducible abdominal hernia. He concluded that, based upon physical examination, Emerson was limited with respect to full squatting and bending. Based on her symptoms and her diagnosed conditions – "her symptomology and disease entity" – he also assessed that Emerson "is limited on prolonged walking, standing, climbing stairs and heavy lifting." (Social Security Administration ("S.S.A.") Administrative Record "R." at 233.)

### (2) Treatment at Housing Works

On September 11, 2009, Emerson met with Nurse Practitioner ("NP") Jabeen Karimjee at Housing Works – an organization that works with individuals living with and affected by HIV. NP Karimjee performed a musculoskeletal examination, finding that Emerson had full ranges of motion. She had five out of five muscle strength in her upper extremities, four out of five muscle strength in her right lower extremity, and five out of five muscle strength in her left lower extremity. NP Karimjee noted no focal neurological/cognitive deficits. On a Modified Folstein Mini Mental Status Exam, Emerson obtained a score of 25, which indicates normal cognition. On a Modified HIV Dementia Scale, she obtained a score of 11, when a score of 8 or above is normal.

Emerson told NP Karimjee that she experienced occasional pain from her hernia, had osteoarthritis in her right leg due to a prior trauma, had confusion and problems with her short term memory, and had right upper extremity nerve damage due to a stab wound. In terms of pain, Emerson reported a chronic pins and needles sensation in her ankle, rating the intensity as six out of ten. She said that she was not on any current medication.

On September 18, 2009, Emerson returned to Housing Works for a follow-up examination. She reported an eagerness to begin antiretroviral medications and recounted

numerous areas of pain that went unrelieved by Motrin. She wore a right ankle brace. Examination revealed no clubbing, cyanosis or edema of the extremities. Emerson's abdomen was soft and non-tender, with an abdominal wall hernia. She was prescribed Atripla for HIV, and a trial of Neurontin for possible neuropathic pain. She also was referred for evaluation of her Hepatitis C and complaints of arthritic pain.

On September 29, 2009, Emerson underwent a psychiatric evaluation at Housing Works with NPs A. Simpson and Robin Foley. Emerson reported symptoms of depression, which included sleep disturbance, low energy, helplessness, and a loss of interest in activities. She also complained of migraine headaches. She said that she was being seen by a doctor for psychiatric treatment and was on Lexapro and Seroquel. She also reported a history of sexual abuse as a child, and domestic abuse as an adult. She believed that she had contracted HIV from one of multiple rapes.

Upon examination, Emerson's affect and range of emotions were normal and appropriate to content. Her psychomotor activity was neutral. She was alert, awake and oriented. Her concentration was good, but her long term recall and retention, intellectual functioning and ability to abstract were poor. Her fund of knowledge and impulse control were fair to poor. Her short term recall, insight and judgment regarding her conditions were fair.

At this time, Emerson was diagnosed with bipolar disorder, depression, nicotine dependence and insomnia on Axis I; deferred diagnoses on Axis II; HIV, Hepatitis C, status post motor vehicle accident, status post stabbing, left brain injury and migraines on Axis III; difficulties related to education, housing, economics, psychosocial environment, and her primary

support group on Axis IV; and a GAF of 50 on Axis V.[2] Emerson was prescribed Lexapro and

her Seroquel dosage was increased. She was expected to follow-up in a month.

On October 9, 2009, Emerson was seen at Housing Works for a medical follow-up. She

had started antiretroviral medication three weeks earlier, and reported that she was doing well.

She had received a prescription for Keflex for possible cellulitis in her abdominal area, but had

not filled it. Physical examination revealed that she had an abscess and some discharge from a

scar in her abdomen area. Her extremities revealed neither clubbing nor cyanosis. She had mild

edema of the right ankle. She had no erythema or warmth to touch. Emerson was prescribed

Bactrim for her abscess, and was examined by a surgeon who did not recommend surgery for her

hernia. Emerson reported a mild decrease in symptoms in her right arm. Her prescription for

Neurontin was increased. Emerson also reported increased complaints relating to her right ankle

and was to be referred for evaluation. Blood drawn on this visit indicated that her SGOT (AST)

and SGPT (ALT) were high.[3] Her CD4 count was 393 cells per cubic millimeter of blood

("cumm").[4] Her RNA (viral load) was 28,033 copies/ml ("copies").[5]

---

[2] A GAF of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. See Dwyer v. Astrue, 800 F. Supp. 2d 542, 544 n.2 (S.D.N.Y. 2011).

[3] Aspartate aminotransferase ("AST") detects liver damage. It often is ordered in conjunction with another liver enzyme, alanine aminotransferase ("ALT"), or as part of a liver panel to screen for or help diagnose liver disorders. AST and ALT are considered to be two of the most important tests to detect liver injury. (See Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings ("Def. Br.") at 11 n.10.)

[4] Tests for CD4 and/or CD8 most often are used to monitor HIV disease progression. The number of CD4 cells increases as the HIV infection progresses. Sometimes, a CD4 cell count is compared to the total lymphocyte count and the result is expressed as a percentage. Other times, a CD4 count is compared to a CD8 cell count and the result is expressed as a ratio. According to public health guidelines, preventive therapy should be started when an HIV-positive person, with no symptoms, has a CD4 count under 200 cells per cubic millimeter of blood. (Def. Br. at 10 n.9.)

[5] RNA is HIV nucleic acid that reports how many copies of the virus are present in the blood, and is referred to as the viral load used to monitor the HIV infection over time. A high viral load generally indicates HIV is present and replicating. In someone who has had HIV for some time, but has not yet

On October 23, 2009, an examination at Housing Works revealed that Emerson's abdominal abscess was healing. Her prescription for Neurontin was increased because she denied any pain relief in her right arm. Her referral remained pending for osteoarthritis evaluation. Emerson also was to be referred for a second opinion regarding hernia surgery. Emerson stated that she had no interest in a sonogram to evaluate her Hepatitis C.

On November 18, 2009, Emerson's antiretroviral regimen was adjusted due to genotype test results. Physical examination revealed an area of erythema on her stomach but no drainage. Emerson did not return to Housing Works after November 2009.

### (3) All Med Medical and Rehabilitation

On December 17, 2009, Emerson was seen at All Med Medical and Rehabilitation ("All Med") for a refill of medications. Her most recent CD4 count – taken on December 2, 2009 – had been 463 cumm with a viral load of 189,729 copies. Her antiretroviral medications accordingly were adjusted. On March 29, 2010, Emerson returned to All Med for evaluation and refill of medications.

On May 12, 2010, Dr. Michael Pierce met with Emerson for an initial HIV evaluation. Emerson presented a history of opiate drug use, HIV, neuropathy, Hepatitis C (apparently treated for six months with Interferon), leg and jaw fractures, migraine headaches, and bipolar disorder with no history of psychiatric hospitalization. She denied any current depressive symptoms or anhedonia. She reported that her appetite was good, but that she slept poorly.

Dr. Pierce's physical examination revealed that Emerson was alert, oriented and ambulatory. Emerson rated her pain level as seven out of ten. Her abdomen was soft and non-

---

started treatment, a high viral load means that the person's immune system is no longer able to suppress HIV replication and that the disease is progressing. During treatment and monitoring, a high viral load can be anywhere from 5,000 to 10,000 copies. (Def. Br. at 10 n.8.)

tender. No edema, clubbing or cyanosis of the extremities was revealed. No neurological focal deficits were revealed. Emerson's viral load was 184,700 copies. Her CD4 count was 463 cumm. Dr. Pierce assessed that Emerson was virologically unstable. He further assessed HIV neuropathy, Hepatitis C co-infection, migraines, opiate dependence, and tobacco abuse. He adjusted Emerson's antiretroviral medications accordingly, and prescribed Percocet and Ambien. He referred Emerson for gynecological and psychiatry consultations.

On September 22, 2010, Emerson had blood drawn. Blood test results indicated that her viral load was 4,449 copies. Her CD4 count was 352 cumm.

After May 2010, Emerson was seen nearly monthly for her medical conditions. Initially, Emerson was noncompliant with antiretroviral medications, but by September 2010, she had achieved compliance and her viral load dropped to 4,449 copies in October and to 315 copies in November. Progress notes reflected, generally, that Emerson's vital signs were stable, that she could walk and was in no acute distress, and that she presented no signs of jaundice. Emerson described her sleep as ranging from poor and disruptive to good. In November and December 2010, she reported back and leg pain. In December 2010, she complained about her hernia and sought to have surgical repair. There is no indication that a surgical evaluation was ever performed.

Progress notes also reflect Emerson reporting that Imitrex was effective for her migraine headaches, Percocet helped with her pain, and that Seroquel stabilized her mood. Emerson did not follow-up with her psychiatric referral, and in December 2010 the referral was deferred. In January 2011, Emerson declined another psychiatric referral. She again was referred in February 2011 and March 2011, but there is no indication that she met with a psychiatrist.

On February 15, 2011, at Emerson's request, a physician's assistant[6] at All Med provided a summary of her care. According to that report, Emerson "suffers from chronic low back pain s/p stab wounds + also suffers from neuropathy of upper + lower extremities [related] to HIV. Subsequently, she has difficulty [with] heavy lifting. Also, heavy lifting needs to be avoided in order to not aggravate abdominal hernia any further."

## II.    The Administrative Hearing

In at least 1990 and 1992, Emerson filed applications for disability benefits, which were denied. Also in 1992, the S.S.A. awarded SSI benefits to Emerson, but those benefits were discontinued, and she was denied again in 2003. In November 2005, the S.S.A. awarded SSI benefits to Emerson, but discontinued those benefits when Emerson was incarcerated for longer than one year. See 20 C.F.R. §§ 416.1325 (suspension of benefits due to status as resident in public institution), 416.1335 (termination following 12 consecutive months of suspension).

On October 30, 2008, Emerson filed her current application for SSI disability payments. She explained that, due to her physical and mental impairments, she had difficulty lifting, walking, standing, climbing stairs, kneeling, squatting, reaching and using her hands. Regarding her activity level, she wrote that she prepared meals using a microwave, sometimes did laundry, shopped for food, and was able to handle her own money. She read and watched television, socialized with others once a week, although sometimes had trouble getting along with other people when she was depressed. She denied having any personal care issues, and also stated that she went out ever two days or so, using public transportation by herself.

---

[6] This individual's position appears unclear: the ALJ calls the person a physical therapist, but the Commissioner's brief refers to the person as a physician's assistant. For clarity, the Court will refer to the individual as a physician's assistant, but the distinction is not dispositive on any issue.

On March 11, 2009, the S.S.A. wrote to inform Emerson that her application had been denied. On August 10, 2009, Emerson requested a hearing before an administrative law judge ("ALJ"). The Office of Disability Adjudication and Review accordingly scheduled a hearing for February 8, 2011.

On February 8, 2011, Emerson and her counsel appeared before ALJ Mark Solomon. She testified that she walk half a block before she had trouble breathing, which she attributed to her two collapsed lungs. She said she could sit for 20-minutes to half an hour, and stand for less than 20-minutes because of weakness in her ankle. She said that her back and legs gave her pain, and that she had stabbing pain in her right hand. She became easily confused when trying to use public transportation. She also stated that she sometimes had difficulty taking care of her personal needs, and spent her days trying to read (but had difficulty concentrating on what she read), lying in bed and sleeping.

On May 18, 2011, the ALJ issued a written decision finding that Emerson was not disabled. At step one, he found that Emerson had not engaged in substantial gainful activity since her application date of October 30, 2008. At step two, he found that Emerson had two severe impairments: a HIV infection and a history of abdominal hernia. He also found, however, that Emerson's Hepatitis C, arthritis, back pain, and determinable mental impairment of bipolar disorder were not severe. At step three, he found that Emerson did not have an impairment or combination of impairments that would make her *per se* disabled. Before moving to step four, he determined that Emerson had the residual functional capacity to perform the full range of light work – which meant that she could lift and carry 20 pounds occasionally and ten pounds frequently, sit for two hours, stand and walk for six hours in an eight hour workday, and occasionally squat, kneel and climb. At step four, he found that Emerson had no past relevant

work. Finally, at step five – in light of Emerson's RFC, age as a younger individual within the age range of 18-49 on the date she applied for SSI benefits, and her education level and ability to communicate in English – he concluded that jobs in significant numbers existed in the national economy that she could perform under the Medical Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App'x 2 (the "Grids"). Accordingly, the ALJ concluded that a finding of "not disabled" was directed by Medical-Vocational Rule 202.20.

### III.   Supplemental Evidence Submitted to Appeals Council

After Emerson's administrative hearing, the ALJ subpoenaed medical records from All Med. All Med did not respond until July 5, 2011, however, which was after the hearing decision was issued. These records then were submitted to the Appeals Council.

The supplemental records provided duplicates of Emerson's medical records dated through January 2011, and additional evidence of Emerson's nearly monthly follow-up visits to All Med. February 15, 2011 progress notes reflected that Emerson's viral load was less than 48 copies and that her CD4 count was 473. She requested a letter for her SSI claim stating that she could not do any lifting (which her doctor counseled against requesting) and reported that her pain was "too much." (R. at 360.) On March 15, 2011, and May 16, 2011, Emerson reported feeling well overall. In May, Emerson complained of chronic lower back pain and right leg pain, but examination revealed no acute distress. At that time, Emerson was ambulatory and did not experience pain when lifting her leg while her knee remained straight. Her forward flexion, however, was painful. Her dosage of Percocet was reduced, and she was prescribed Flexeril and Tramadol, and reissued a psychiatric consultation referral. She also was referred for a surgical consultation regarding her hernia.

On June 16, 2011, Dr. Peirce saw Emerson for a follow-up examination. Emerson tested positive for cocaine and her prescription for Percocet was discontinued. She was prescribed Tramadol, Flexeril and Naprosyn for her right leg and lower back pain, and was scheduled to see an orthopedist the following month. She presented with some deformity of her right ankle, with a prominent lateral malleolus. She had decreased sensation of her right foot and a reducible bulge in her abdomen. She was referred for a surgical evaluation of her hernia and for a psychiatric consult for her bipolar disorder.

The ALJ's decision became the final decision of the Commissioner on July 9, 2012, when the Appeals Council denied Emerson's request for review.

## PROCEDURAL BACKGROUND

On August 23, 2012, Emerson filed this *pro se* action. On October 9, 2012, the Honorable Paul A. Crotty referred Emerson's case to a magistrate judge for a report and recommendation. On October 11, 2012, that referral was reassigned to my docket. On April 24, 2013, the Commissioner filed a motion for judgment on the pleadings with supporting memorandum of law. Because Emerson did not timely oppose that motion, and in light of her *pro se* status, on May 30, 2013, I extended Emerson's time to oppose the Commissioner's motion by two weeks. She did not reply, and the motion became fully briefed. On July 30, 2013, Emerson wrote a letter to Judge Crotty requesting that her SSI benefits be reinstated. On August 16, 2013, I ordered that the Commissioner submit to Chambers a letter on an issue requiring further briefing, and provided plaintiff with time to respond. On August 23, 2013, the Commissioner submitted the requested letter, which was docketed on August 27, 2013. Emerson did not reply.

## DISCUSSION

### I.      Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c); Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010) (A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." (citation omitted)). In reviewing a decision of the Commissioner, the Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ must be supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, the Court must grant judgment in favor of the Commissioner, even if there also is substantial evidence for the plaintiff's position. See Perez v. Chater, 77 F.3d 41, 46-47 (2d Cir. 1996); see also Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (finding that "[t]he substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise" (citation and internal quotation marks omitted; emphasis in original)).

15

When, as here, the Court is presented with an unopposed motion, it may not find for the moving party without reviewing the record and determining whether there is sufficient basis for granting the motion. See Wellington v. Astrue, 12 Civ. 03523 (KBF), 2013 WL 1944472, at * 2 (S.D.N.Y. May 9, 2013) (recognizing, in an action appealing the denial of disability benefits, the court's obligation to review the record before granting an unopposed motion for judgment on the pleadings); Martell v. Astrue, 09 Civ. 01701 (NRB), 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (same); cf. Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004) ("[C]ourts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." (citation and internal quotation marks omitted)).

Pro se litigants "are entitled to a liberal construction of their pleadings," and therefore their complaints "should be read to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (citation and internal quotation marks omitted); see Alvarez v. Barnhart, 03 Civ. 08471 (RWS), 2005 WL 78591, at *1 (S.D.N.Y. Jan. 12, 2005) (articulating liberal pro se standard in reviewing denial of disability benefits); see also Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

## II. Definition of Disability

A claimant is disabled under the Act if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A determinable physical or mental impairment is defined as one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be determined to be disabled only if the impairment(s) are "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, App'x 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the final step. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Thus, in order to support a finding that the claimant is not disabled at the fifth step, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity, age, education

and past relevant work experience. 20 C.F.R. §§ 404.1512(f), 404.1560(c), 416.912(f), 416.960(c).

The Code of Federal Regulations provides additional guidance for evaluations of mental impairments. Calling it a "complex and highly individualized process," 20 C.F.R. § 404.1520a(c)(1), the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis," 20 C.F.R. § 404.1520a(c)(2). The main areas that are assessed are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. The first three are rated on a "five-point scale:" none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The last area, episodes of decompensation, is rated on a "four-point scale:" none, one or two, three, and four or more. Id. If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2).

A mental disorder will qualify as a "listed impairment" if it is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. To reach the required severity requirement, the individual must (A) show signs of depressive, manic, or bipolar syndrome, and *either* (B) experience "marked restriction" in two of the following: (i) activities of daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation (the so-called "B Criteria"); *or* (C) "have a medically documented history of chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms

18

or signs currently attenuated by medication or psychosocial support" (the so-called "C Criteria").

Id.

An anxiety-related disorder will qualify as a "listed impairment" if it is "the predominant disturbance or . . . the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06. To reach the required severity level, the individual must have: generalized persistent anxiety; a persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid it; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom; recurrent obsessions or compulsions which a source of marked distress; or recurrent and intrusive recollections of a traumatic experience. These symptoms must either (A) result in "marked restriction" in two of the following: (i) activities of daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation; or (B) result in complete inability to function independently outside the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

## III.   Analysis of the ALJ's Sequential Evaluation

Reading her complaint and July 30, 2013 letter to Judge Crotty liberally, Emerson appears to test the ALJ's conclusion that she was not disabled by challenging the ALJ's determinations of her severe impairments, her RFC and, at step five, that significant employment existed for her in the national economy. Because the ALJ incorrectly determined Emerson's RFC, she is entitled to remand of her case.

### A. Step One

Applying the sequential evaluation of disability, at step one the ALJ found that Emerson had not engaged in substantial gainful activity since her alleged disability onset date of October 30, 2008. The parties do not contest this determination and it is supported by substantial evidence.

### B. Non-Mental Impairments: Step Two

#### (1) HIV and Adnominal Hernia

The ALJ found that Emerson's HIV infection and abdominal hernia were severe impairments. These findings are uncontested and supported by substantial evidence. Emerson has HIV, with the virus detectable through the period at issue, and resulting limitations. Emerson developed a post-surgical hernia after her August 2005 assault and rape. As a result of that trauma, she felt pain and was treated for infection on repeated occasions, and she had to avoid heavy lifting. See 20 C.F.R. § 404.1520(c) (stating that an impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities).

#### (2) Arthritis and Hepatitis C

By contrast, the ALJ found that Emerson's arthritis and Hepatitis C were not severe impairments. These findings require additional scrutiny because, as the Court of Appeals for the Second Circuit has cautioned, the step two analysis should do no more than "screen out *de minimis* claims." Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995). Nonetheless, a claimant does not meet her burden with unsubstantiated allegations of impairment. See Meadors v. Astrue, 370 F. App'x 179, 182 (2d Cir. 2010) (finding substantial evidence supported ALJ's finding that certain impairments were not severe when, *inter alia*, the medical record did not establish severity); Ortiz v. Astrue, 875 F. Supp. 2d 251, 260 (S.D.N.Y. 2012) (finding plaintiff's alleged

lupus was not severe when it found "no corroboration in any clinical findings, objective diagnosis, or treatment plan"); Monell v. Astrue, 08 Civ. 00821, 2009 WL 4730226, at *5 (N.D.N.Y. Dec. 3, 2009) (finding lack of evidence that claimant "ever suffered from an episode of decompensation" supported finding that impairment was not severe). Rather, an impairment is severe if it "significantly limits physical or mental abilities to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). And conversely, an impairment is not severe if it does not significantly limit an individual's ability to perform basic work activities. 20 C.F.R. § 404.1521(a).

In evaluating the ALJ, the Court is guided by the S.S.A. Regulations, which define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include:

> (1) Physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b).

Here, the ALJ found that there was no medically determinable impairment documented in the record caused by arthritis and her Hepatitis C was not severe. These findings are supported by substantial evidence. Emerson has established that she had arthritis and Hepatitis C during the relevant period, but has submitted no evidence that these impairments limited her ability and aptitude to perform basic work activities, and thus were severe. See Britt v. Astrue, 486 F. App'x 161, 163 (2d Cir. 2012) (finding that claimant's argument that ALJ incorrectly determined that his arthritis was not severe was without merit because he did not provide any medical evidence

showing how his alleged impairment limited his ability to work); DiPalma v. Colvin, __ F. Supp.

2d __, 12 Civ. 06708 (AJP), 2013 WL 3243554, at *12 (S.D.N.Y. June 28, 2013) ("[T]he mere

presence of a disease or impairment, or establishing that a person has been diagnosed or treated

for a disease or impairment, is not, by itself, sufficient to render a condition severe." (citation and

internal quotation marks omitted)); Melillo v. Astrue, 06 Civ. 00698 (LEK)(DEP), 2009 WL

1559825, at *16-17 (N.D.N.Y. June 3, 2009) (finding that claimant's osteoarthritis was not

severe – when plaintiff was diagnosed with osteoarthritis and testified that his arthritis was body-

wide and particularly affected the area from his ankles to his knees – because there was no

objective evidence of more than minimal impact or diagnostic evidence).

### (3) Back Pain

Finally, the ALJ determined that Emerson's back pain was not severe because the

impairment lacked a medical diagnosis. This determination was contrary to substantial evidence

that supported a finding that her back pain was severe, and contrary to the ALJ's own finding,

later in his decision, that there was a medical diagnosis of back pain. Regarding the first point,

Emerson's physician's assistant found that Emerson "suffer[ed] from chronic low back pain"

stemming from a medically determinable past stabbing trauma and "[s]ubsequently . . . has

difficulty [with] heavy lifting." (R. at 307.) Corroborating this determination, Emerson presented

many subjective complaints of severe back pain – including testimony at the ALJ hearing that

her pain was unbearable. At this "*de minimis*" evidentiary stage, Dixon, 54 F.3d at 1030, it was

error for the ALJ to discount such evidence.[7] Regarding the second point, the ALJ would later

---

[7] See also Laframboise v. Comm'r of Soc. Sec., 11 Civ. 01214 (NAM), 2013 WL 1019326, at *7-8
(N.D.N.Y. Mar. 14, 2013) (finding that physical therapy treatment notes for back condition, combined
with medical source statement opining that claimant's back condition restricted his ability to lift, carry,
stand, sit and walk, as well as providing postural limitations, showed that claimant's back condition
potentially presented significant limitations on his ability to perform work-related functions and,

refer to the physician's assistant's evaluation as a "medical opinion" that was "given considerable weight in light of the record evidence." (R. at 21.) Thus, it also was error for the ALJ to find the physician's assistant's determination was a persuasive medical opinion for one purpose, yet ignore its relevance for another.[8]

### C.  Non-Mental Impairments: Step Three

At step three, the ALJ summarily concluded that Emerson does not have an impairment or combination of impairments that meets or medically equals a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App'x 1, see 20 C.F.R. §§ 416.920(d), 416.925, 416.926. He reached this conclusion because Emerson could perform simple grasping, fingering and handling, and because her physician's assistant only noted limitations in heavy lifting. The Court assumes that this finding concerned only Emerson's HIV status and hernia, as those are the only impairments he found severe in step two. With respect to these impairments, the ALJ's determination is supported by substantial evidence that includes Dr. Flores's finding that Emerson's muscle strength was five out of five and her hand dexterity and fine manipulation were normal.

The ALJ did not, however, proceed to step three with respect to Emerson's back impairment. This error is not harmless even though the ALJ considered her impairment in his RFC analysis. Cf. Reices–Colon v. Astrue, 12–2013, 2013 WL 1831669, at *1 (2d Cir. May 2, 2013) (finding alleged step-two error harmless because ALJ considered impairments during

_____

therefore, the ALJ's rejection of that condition at step two was in error); cf. Crews v. Astrue, 10 Civ. 05160 (LTS)(FM), 2012 WL 1107685, at *15 (S.D.N.Y. Mar. 27, 2012) (agreeing with ALJ that, at step two, claimant's back problems limited his physical ability to perform basic work activities when doctors indicated that claimant would be capable of performing only a position that did not require heavy lifting, repetitive bending, twisting or carrying), adopted by 2012 WL 2122344 (S.D.N.Y. June 12, 2012).

[8]  Obviously, an ALJ does not need to adopt a medical professional's entire opinion and may, instead, weigh parts of an opinion against the record evidence; but an ALJ may not rely on part of an opinion for one purpose and deny its existence at other times.

subsequent steps). The Court cannot determine whether the ALJ would have made the same RFC determination if he had accurately valued Emerson's back pain as severe. See Kohler v. Astrue, 546 F.3d 260, 268 (2d Cir. 2008) (stating, in context of ALJ's failure to properly evaluate severity of mental claimant's mental impairments, that "[i]t also is not clear whether the ALJ would have arrived at the same conclusion regarding [claimant's] [RFC] to perform work had he adhered to the regulations"); cf. Keyser v. Comm'r of Soc. Sec. Admin., 648 F.3d 721, 727 (9th Cir. 2011) (remanding after finding, in mental impairment context, that "because we hold that the ALJ erred in his determination of the severity of [claimant's] impairment at step two, we cannot determine whether the impairment was in fact severe, thereby triggering the meets or equals analysis under step three"). Accordingly, remand is also appropriate at step three so that the ALJ can conduct a more complete review of the record evidence related to Emerson's back pain.

### D. ALJ's Determination of RFC

Before proceeding to step four, the ALJ determined that Emerson had the residual functional capacity to perform the full range of light work, finding that she could lift and carry 20 pounds occasionally and 10 pounds frequently, sit for two hours, stand and walk for six hours in an eight hour workday, and occasionally squat, kneel and climb.

The Act defines light work as involving:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities. If someone can do light work, [the S.S.A.] determine[s] that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

24

20 C.F.R. § 404.1567. For light work specifically, a claimant should be able to stand or walk, off and on, for a total of six hours in an eight hour workday. <u>Acevedo v. Barnhart</u>, 02 Civ. 00652 (AKH), 2003 WL 841089, at *4 (S.D.N.Y. Mar. 6, 2003) (quoting Soc. Sec. Rul. 83-10, 1983 WL 31251, at *6 (S.S.A. 1983)).

### (1) Substantial Evidence

The ALJ found that Emerson could perform light work. But in making this determination, the ALJ incorrectly interpreted a note from Emerson's physician's assistant and a statement by a state disability examiner. The Court cannot say that, absent these errors, the ALJ would have determined that Emerson could perform light work. Thus, the errors are not harmless, and the case must be remanded.

Turning to first error, the ALJ mischaracterized the determination of Emerson's physician's assistant. He found that the physician's assistant's note "indicate[d] that she [was] only limited in heavy lifting." (R. at 21.) But taken as a whole, the note reads that Emerson "suffers from chronic low back pain s/p stab wounds + also suffers from neuropathy of upper + lower extremities [related] to HIV. Subsequently, she has difficulty [with] heavy lifting. Also, heavy lifting needs to be avoided in order to not aggravate abdominal hernia any further." (R. at 307.) It does not necessarily follow that Emerson was unlimited in her ability to perform light lifting just because she had difficult with heavy lifting. Indeed, without any context to the statement, it is conceivable that the physician's assistant was asked only about Emerson's ability to perform heavy lifting, or tested her only regarding the same. *Expressio unius est exclusio alterius* simply does provide a persuasive rational.

The physician's assistant was not asked, and did not opine on whether Emerson could perform light work. At the least, it was error for the ALJ to find that this note provided "considerable weight" to establish that Emerson was limited only as to heavy lifting, and thus could perform light lifting. The actual note is significantly less clear. This error is especially significant because, absent the ALJ's interpretation, there is no other evidence clearly showing that Emerson could lift the occasional 20 pounds or frequent 10 pounds necessary for light work. Moreover, to the extent the ALJ used the note as general support of his RFC determination, it provides no evidence that Emerson was able to perform the "good deal of walking or standing" or other tasks necessary for most light work.

Turning to the second error, the ALJ stated that the "state agency medical consultant's opinion that [Emerson] can do light work is given considerable weight as it is consistent with the record as a whole." (R. at 21.) This statement was unsupported by any citation and was not raised elsewhere in the ALJ's opinion. The Court, accordingly, requested additional letter briefing to clarify its origin. The Commissioner responded by stating that the "ALJ's statement clearly misidentified the author of the report as a medical source." (Commissioner's Letter ("Def. Ltr.") at 2.) The statement appears actually to have been made by "S. Staub," the State agency disability examiner who completed the physical RFC assessment at the initial level of social security disability review. (Id. at 1.) This person is not a doctor, although the ALJ treated him as such.

"It is [] error to treat 'a disability analyst as a doctor.'" Tankisi v. Comm'r of Soc. Sec., 12-1398-cv, 2013 WL 1296489, at *5 (2d Cir. Apr. 2, 2013) (citing Castano v. Astrue, 650 F. Supp. 2d 270, 281 (E.D.N.Y. 2009)); see Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2007) ("[T]he ALJ inadvertently weighed the opinion of a lay person under the rules appropriate for

weighing the opinion of a medical consultant, which would be a legal error in applying the ruling.").

In her letter to the Court, the Commissioner argues that the error was harmless. The Court disagrees. The error would be harmless if it was consistent with the opinions of other physicians or otherwise supported by substantial evidence. See Tankisi, 2013 WL 1296489, at *5 (finding ALJ's reliance on state disability analyst as doctor was harmless because his report was supported by the remainder of the record and consistent with the opinions of two other physicians). But no other medical professional ever opined as to whether Emerson could perform light work. It was error to afford the disability examiner's opinion "considerable weight."

Two additional considerations weigh against finding harmless the ALJ's errors. First, the additional evidence that the ALJ marshaled does not directly establish that Emerson could walk, stand and lift the amounts necessary for light work. He cited that: Emerson's muscle strength was normal; she experienced no pain when conducting leg raises up to 70 degrees; her right knee range of motion was within normal limits, with pain upon flexion; she had no area tenderness; her posture and gait were normal; she did not need a cane to ambulate; she had no difficulty mounting the examination table; and she could do tandem, toe and heel walking and could squat one-third of the way down.[9] This evidence indicates that Emerson could perform some level of

_____

[9] Indeed, this evidence probably is not substantial evidence of light work. See Alwashie v. Apfel, 99 Civ. 08898 (MGM), 2001 WL 135768, at *8 (S.D.N.Y. Feb. 16, 2001) (finding record contained insufficient evidence that claimant could stand and/or walk for a good deal of the day when, *inter alia*, examining doctor did not opine on whether claimant would be capable of such and only testimony that claimant could perform the lifting and carrying necessary for light work came from a non-examining physician); Piechucki v. Heckler, 613 F. Supp. 45, 47 (E.D.N.Y. 1985) (finding that ALJ determination was not supported by substantial evidence when there was "nothing on the record to support a finding that plaintiff can meet the walking and carrying requirements of light work"); Rovers v. Heckler, 577 F. Supp. 766, 770 (S.D.N.Y. 1984) ("There is no evidence in the record which supports a finding that plaintiff is able to sit, stand, or walk during an eight[]hour day for more than two hours each, the durational capacity determined by the orthopedic surgeon who examined plaintiff in December, 1980."); see also Kresin v. Colvin, 12 Civ. 00257 (GTS), 2013 WL 2237823, at *7 (N.D.N.Y. May 21, 2013) (finding ALJ decision

walking, standing, and lifting, but provides no clear showing as to the extent to which Emerson was capable of each action. Thus, the physician's assistant's note and the disability analyst's credentials took on added – if not dispositive – importance in the ALJ's determination, again showing that the error was not harmless.

The ALJ gave these statements considerable weight because he found that they were consistent with the record as a whole. But these statements appear to provide the only clear evidence that Emerson was limited solely in heavy lifting and that she actually could perform light work. As discussed, the other evidence in the record does not necessarily establish Emerson's capacity for light work, and thus is not necessarily consistent with the ALJ's conclusion. Accordingly, the ALJ's basis for giving them considerable weight also is error. See Castano, 650 F. Supp. 2d at 281 ("The only professional evidence in support of a finding of nondisability to which the ALJ referred is [a doctor's] brief evaluation without the benefit of complete medical testing and [another doctor's] peculiar use of the term 'light duty.' Converting a nonprofessional to a physician on this record is not harmless." (citations omitted)).

Second, the ALJ's discounted the findings of doctors who actually treated Emerson and Emerson's own subjective complaints based on his finding that Emerson could perform light work. He found that Dr. Flores's determination that Emerson was limited in prolonged walking, standing, climbing stairs and heavy lifting was based on Emerson's "symptomology and disease entity only, and not on examination findings," and thus only entitled to some weight. (R. at 21.) But absent the "considerable weight" he attached to the physician's assistant's note and the disability analyst's credentials, it is possible that he would have more fully credited Dr. Flores's

was not supported by substantial evidence that claimant could perform light work when there was no record evidence of a physician's finding that he could frequently lift or carry up to 10 pounds, and his physician found that he had marked limitations for, *inter alia*, walking, lifting, carrying and standing).

opinion. See Dewey, 509 F.3d at 449 (remanding because "in light of the presence in the record of a more restrictive opinion from [claimant's] treating physician, we cannot say that the ALJ would inevitably have reached the same result if he had understood that the [RFC] [a]ssessment had not been completed by a physician or other qualified medical consultant").

Similarly, the ALJ's view of the record persuaded him to discredit Emerson's subjective testimony. But if more fully credited, Emerson's testimony strongly would have supported a finding that she could not perform light work. As the ALJ noted, Emerson reported unbearable pain and numbness from her right knee down to her right toes. At her February 11, 2009 examination, she said that she could not walk more than a quarter of a block without right leg pain or stand for more than 15 minutes without leg discomfort, and had to pause after ascending half a flight of stairs, and could not lift more than five pounds. At a September 18, 2009 examination she wore an ankle brace. And in November and December 2010 All Med visits, she also reported leg pain. Although not an exclusive list, these are statements that speak directly to the question of how far Emerson could walk, how long she could stand, and how much she could lift. On the record presented, the Court cannot determine how the ALJ would have weighed this subjective evidence absent his errors.

The ALJ seems to have based his determination that Emerson could perform light work on two wobbly legs that do not support substantial weight. Accordingly, the case should be remanded.

### (2) Credibility Assessment

Turning to an additional basis for remand, the ALJ found that Emerson's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not credible to the extent they [were] inconsistent with the above [RFC] assessment." (R. at 20.) But the

methodology described by the ALJ to explain his credibility determination strongly suggests that he weighed the objective medical evidence against the inability to work.

The Seventh Circuit has found that this approach "gets things backwards" because it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012). The language used here is a boilerplate that the Bjornson court found to be inconsistent with SSR 96-7p. That Ruling states that "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by medical evidence." See Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, Social Security Ruling ("S.S.R.") 96-7p, 1996 WL 374186, at *6 (S.S.A. July 2, 1996). The Seventh Circuit's critique has been adopted by courts in this Circuit. See, e.g., Cruz v. Colvin, 12 Civ. 07346 (PAC)(AJP), 2013 WL 3333040, at *16 (S.D.N.Y. July 2, 2013) ("The ALJ's conclusory reasoning is unfair to the claimant, whose subjective statements about his symptoms are discarded if they are not compatible with an RFC that has been predetermined based on other factors."); Otero v. Colvin, 12 Civ. 04757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief.").

Here, the ALJ made his own assessment that Emerson had the residual functional capacity to perform light work and, subsequently, found that she lacked credibility because her statements were inconsistent with his finding. The Court agrees that this "gets things backwards" in that the ALJ appeared to disregard Emerson's subjective statements solely because, in his

view, they were not substantiated by objective medical evidence. <u>Bjornson</u>, 671 F.3d at 645; <u>see</u>

S.S.R. 96-7p, 1996 WL 374186, at *6; <u>see also</u> <u>Correale-Englehart v. Astrue</u>, 687 F. Supp. 2d

396, 435 (S.D.N.Y. Feb. 8, 2010) ("The issue is not whether the clinical and objective findings

are consistent with an inability to perform all substantial activity, but whether plaintiff's

statements about the intensity, persistence, or functionally limiting effects of her pain are

consistent with the objective medical and other evidence." (citing S.S.R. 96-7p)).

Accordingly, the ALJ's legal error in assessing Emerson's credibility provides an

additional basis for remand.

### E.  Mental Impairment: Steps Two and Three

For the sake of thoroughness, the Court turns to the evidence of mental impairment

presented in the record. Here, the ALJ correctly found that Emerson established the existence of

a bipolar disorder, but that it imposed no more than mild limitations on her ability to perform

basic work activities and, therefore, was not severe. The ALJ found that the medical record did

not demonstrate that Emerson's mental impairments imposed more than mild limitations in her

ability to perform activities of daily living, function socially, and maintain concentration

persistence and pace, and that the evidence did not establish the existence of any episodes of

decompensation. This determination employed the correct legal standard and is supported by

substantial evidence.

In making this finding, the ALJ found that neither the "B Criteria" nor the "C Criteria"

was satisfied. Regarding daily living, the ALJ found that Emerson could prepare simple meals,

do household chores, shop and manage her finances. She left her residence often, traveled alone

and used public transportation. Regarding socialization, the ALJ found that Emerson socialized

with others once per week, and went to the store on a regular basis. Regarding concentration, the ALJ found that Emerson was able to complete tasks and follow written and oral instructions.

Substantial evidence supports the ALJ's finding at each of these points. For example, although at her hearing Emerson described issues with traveling, at several other times (including when she submitted her application for SSI benefits) she stated that she was able to travel on her own. Her doctors generally describe her movement, socialization, and concentration in terms that support a finding that her impairments imposed no more than mild limitations. Significantly, Dr. Meadow opined that Emerson had a psychiatric disorder that did not necessarily interfere with her ability to function either on a daily basis or in a vocational setting. Moreover, Emerson's score of 25 on a Modified Folstein Mini Mental Status Exam, showing normal cognition, and her score of 11 on a Modified HIV Dementia Scale, which was above normal, contribute to the picture of an individual that was not severely impaired by her bipolar disorder.

Regarding episodes of decompensation, the ALJ noted that Emerson had never been psychiatrically hospitalized. Indeed, Emerson has not shown that she needed a more structured psychological support system. And to the extent the record shows alterations in dosages and medications to deal with Emerson's complaints, they are not the "significant alteration in medication" contemplated by the Regulations. See 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00 C(4). Rather, they appear to be minor adjustments to optimize dosage levels.

The additional evidence in the record does not otherwise indicate that there was more than a minimal limitation to the Emerson's ability to do basic work activities. Although two GAF test results – one before and one after her alleged onset date – point to impairment, Emerson "cites to no authority, and the Court is aware of none, holding that a GAF score – in and of itself – demonstrates that an impairment significantly interferes with a claimant's ability to work."

32

Parker v. Comm'r of Soc. Sec. Admin., 10 Civ. 00195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011) (collecting Court of Appeals cases and citing Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 511 (6th Cir. 2006) ("[W]e are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score.")).

The inquiry at these stages is intended to determine whether a claimant's mental impairment impedes her ability to work, through looking at areas of conduct that the S.S.A. has found to be especially relevant to work. See 20 C.F.R. at §§ 404.1520a, 416.920a. But Emerson does not connect her impairments to any such inability to work. Thus, the ALJ's determination of Emerson's mental impairments is supported by substantial evidence.

The Court notes that the ALJ considered Emerson's mental impairments in his evaluation of her RFC, but that analysis is not discussed in this opinion because it is not relevant to the reasons why the case must be remanded.

### F.  The ALJ's Determination at Steps Four and Five

After determining Emerson's RFC, the ALJ found that Emerson had no past relevant work. That determination is consistent with the record, uncontested, and supported by substantial evidence. At step five, the ALJ found that Emerson retained the capacity to perform light work, and thus was not disabled because suitable work existed in significant numbers that Emerson could perform. But, as discussed, this determination was based on an erroneous evaluation of Emerson's RFC and thus is not supported by substantial evidence. See, e.g., Mezzacappa v. Astrue, 749 F. Supp. 2d 192, 209-210 (S.D.N.Y. 2010) (remanding case to Commissioner when finding that claimant could perform light work was not supported by substantial evidence). The case must be remanded so that the ALJ can make a new determination at step five based on a reevaluation of Emerson's RFC.

### III.    Supplemental Evidence

"[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez, 77 F.3d at 45. On remand, the Commissioner must consider the supplemental evidence provided after the ALJ's determination as part of the administrative record. See Jones v. Comm'r of Soc. Sec., 12 Civ. 04815 (JPO)(JCF), 2013 WL 3486994, at *12 n.10 (S.D.N.Y. July 11, 2013).

### CONCLUSION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be DENIED, and the case remanded to the Commissioner for further proceedings consistent with this opinion.

*        *        *

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS
### TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be

addressed to Judge Crotty. The failure to file these timely objections will result in a waiver of

those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b),

72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:      New York, New York
              September 16, 2013